(43 Misc. Rep. 164.)

SOUTHARD et al. v. GEORGE W. JUMP CO. et al.

(Supreme Court, Special Term, New York County. March, 1904.)

1. CONTRACTS—FRAUDULENT COMBINATION—EQUITY—RELIEF OF PARTIES.

A railroad company, desiring a large number of buildings removed from its land, invited ten persons, who comprised practically all in a particular locality able to do the work, to make their individual offers for the same; but, instead of doing so, these persons entered into a secret arrangement to deceive the company into believing that each bid was the independent best offer of the individual, by putting in a series of false lower bids, so as to assure the award of the contracts to the bidder who represented not himself, but all of them. Party to whom the contracts for the work should be awarded was to offer them for sale at auction to the other parties to the agreement, and assign them to the highest bidders. The difference between the contract price and the auction price was to be divided equally among the parties to the agreement. *Held*, that the combination was fraudulent as to the railroad company, and that where two of the ten bidders, after securing the contracts, refused to put them up at auction as agreed, equity would not give relief to the other parties to the contract.

Action by Charles H. Southard and others against the George W. Jump Company and others. Motion to continue an injunction pendente lite. Injunction vacated.

Wakelee & Davison (L. Laflin Kellogg, of counsel), for plaintiffs.

Felix H. Levy (William N. Cohen, of counsel), for defendant George W. Jump Co.

Lamont McLoughlin, for defendant F. M. Hausling Co.

LEVENTRITT, J. I am of the opinion that the injunction should not be continued, as the plaintiffs do not come into equity with clean hands. The preliminary injunction was granted on a complaint and affidavits that showed a harmless contract. It was made to appear that the plaintiffs and defendants had on November 27, 1903, entered into

an agreement to engage in the joint venture of purchasing from the Pennsylvania, New York & Long Island Railroad Company certain buildings owned by it, razing them and disposing of the materials. The moving papers are silent as to the manner in which this joint agreement to purchase was to be carried out. It is merely alleged that the party or parties to whom the contracts for the removal of the buildings should be awarded should offer them for sale at auction to the ten parties to the agreement, and assign them to the highest bidders. The difference between the purchase price from the Pennsylvania Company and the auction price was to be divided equally among the parties to the agreement. It is alleged that bids were put in by all the parties; that all bids were rejected, and no awards made thereunder. It is then alleged that on December 9, 1903, the parties entered into what is claimed to have been a further agreement whereby the original one was confirmed, and a further stipulation made that any contract obtained by any of the parties, and any information in regard thereto, should be the property of all, and that the profits to be derived therefrom should be determined in the manner originally agreed upon. The complaint then sets out that on December 20th the defendant F. M. Hausling Company purchased for the sum of $15,000, and agreed to remove approximately one half of the buildings, and the defendant George W. Jump Company made a similar contract as to the other half; that they have refused to carry out the agreement to put up the contracts at auction, despite demand made, and in violation of their contract with the plaintiffs; that they are excluding the plaintiffs from·all participation, and are razing and removing the buildings, and appropriating the materials to their own benefit. The difference between the contract and the estimated auction price is said to be between $25,000 and $30,000, and relief is asked that the defendants be required specifically to perform the agreement with the plaintiffs, and that a receiver be appointed to take charge of the property covered by the two separate contracts, and to carry them out for the benefit of all the parties.

The answering affidavits, with the deposition of one Kircher, the president of one of the plaintiffs, taken at the instance of the defendants, give a different complexion to the case. The main facts, on the basis of all the affidavits, are substantially ·undisputed; and in the few instances where, on conflicting statements, I have accepted the defendants' version, it has been because no other inference is permissible. So far from this being a harmless joint venture between several persons on one side, and a private party on the other, fencing for a contract under the most advantageous terms, the papers disclose what comes very close to a conspiracy, and, in any event, amounts to such fraud on the rights of a third person that a court of equity will leave its hands off.

The plaintiffs and defendants constitute the chief house-wrecking concerns in this city and vicinity. While the plaintiffs claim that there are others in addition to the parties to the action, whom they designate as "good and reputable concerns," the allegation in the defendants' affidavits that the parties to this suit constitute all the important, substantial concerns is undenied. The inference is not unwarranted that the plaintiffs and defendants include practically all the wreckers with the necessary facilities to undertake the work of the magnitude offered

by the Pennsylvania Company, and to complete it within the time limit required. Perhaps it is not very material whether or not there were other concerns, for the bidding was not general and open, but was restricted to those invited by the company. It appears by the affidavit of one of the company's engineers that the only bids received were those of the parties hereto. This fact that the bidding was by invitation I take to be an important feature of the case. The arrangement between the parties might not, in view that this was a private contract at private letting, have been so culpable; had the bidding by virtue of the invitation not been restricted to them. Even if there were one or two outsiders who did not respond to the invitation, the acts of the parties were nevertheless guilty.

Bids having thus been invited, the parties met pursuant to an arrangement on November 27, 1903. Everybody was required to present credentials; that is to say, give proof of the fact that an invitation to bid had been extended. In fact, there was a temporary doubt as to permitting one of the parties to participate, as he had not his invitation with him; but, as he was doing other similar work for the Pennsylvania Company, probability was allowed to re-enforce his word that he was qualified to become a member of the contemplated pool.

What the complaint designates the joint venture of purchasing from the Pennsylvania Company the buildings and materials in question was then elaborated in this fashion: The defendants claim, and Kircher, in his examination admits, that the sense of the meeting was summed up substantially in these words: "We will bid it [the contract] in, and get it home, and then we will sell it among ourselves, and then we will divide the profits." Whether this precise language was used or not, this is nevertheless just what was attempted to be done. The buildings to be razed and sold were offered to the bidders in four sections. The parties determined first who of the ten members of the pool or combination should put in the highest bid on each section. This was done by a secret ballot, the four receiving the highest number of votes being directed to put in the highest bids. The amount of these bids was again determined by secret ballot. Each member, with the exception of one who had not inspected the property, placed on a slip of paper, without signing his or its name, a figure for each section—presumably what he or it thought the pool should offer for the work. These bids were then averaged. In three out of the four sections, arbitrary deductions were made, and the member to whom the bid had been allotted was directed to put it in at the stipulated figure. The other members in each case agreed to put in lower bids, so that there would be no question as to whom the contract should go. An interesting fact is disclosed by these secret bids, in that one member put in a ridiculously low estimate, even for the low estimates generally made, and this for the avowed purpose of bringing down the average to a low figure. Further details were arranged, which it is not now necessary to enlarge upon; the agreement and understanding being that the four highest bidders were bidding on behalf of the pool; that, if and when the contracts should be awarded, they should be offered at auction to the members of the combination; and that the difference between the price to be paid to the Pennsylvania Company and the price to be realized at the auc-

tion sale should be divided as profit among the members. Certain facts are alleged as to which there is marked conflict in the affidavits, and as to which no definite conclusion can here be reached. But as to some of them it is to be said that the defendants' version seems consonant with the general scheme to defraud the Pennsylvania Company, and to keep it in ignorance of the fact that it was getting one bid where it expected ten. Thus the defendants' claim that, after the bids had been put in, each member was to ring up the company and solicitously inquire whether the contract had been awarded. Kircher admits that there was some talk about ringing up, but that there was no agreement. Again, it is claimed that the bidder on behalf of the pool should lend his signs to the successful auction bidder, so as to avoid suspicion and comment on the fact that the wrecking was being done by a person other than the one to whom the contract had been awarded.

All the bids had to be handed in to the Pennsylvania Company on November 30th, three days after the meeting. It seems that the members of the pool were suspicious of each other, for each was required, on the morning of the 30th, before turning in his agreed bid, to submit it to the chairman of the pool for verification. That the manner of arriving at the bids and their amount has been here correctly outlined finds confirmation in the affidavit of the Pennsylvania Company's engineer, who annexes a list of all the bids received.

The aggregate of the highest offers for the four sections was approximately $17,000. The Pennsylvania Company promptly rejected all bids, and thereupon the parties to this action met again. On December 9th, after discussing ways and means, and mindful of the fact that they were the substantial concerns in this particular line of business, and the only ones who had theretofore been invited to bid, they adopted and severally subscribed the following resolution:

"That this body stand together and agree not to call upon or in any way propose to the Pennsylvania R. R. for the work in question, and if either one of this body obtains any information the same shall be given to the temporary chairman who shall call this body together to act upon said information."

This resolution was characterized by Kircher, in his examination, as confirming and carrying out the original agreement. "It was simply a step in the enterprise to make it more binding."

For the purpose of this decision, it is not necessary to trace the facts much further. On December 15th the defendant George W. Jump Company notified the chairman of its intention to withdraw from the joint agreement. The chairman pleaded with the Jump Company by letter not to take "undue advantage" of the members of the body, and to defer action until a meeting had been held to consider the letter of withdrawal. A meeting was called at which there appears to have been much confusion, the result of which leaves in some doubt the question whether or not the pool was dissolved. But whether it was or not is not very material, in the view I take of the case. The defendant F. M. Hausling Company likewise withdrew. The two defendants renewed offers to the Pennsylvania Company; each bidding for one-half of the work, and securing it at $15,000 for each of the two sections. It is proper to state that one of the sections included four buildings not in-

cluded in the original estimates, but the value of these is by no means large enough to explain the discrepancy between the first total of $17,-000, and the final award of $30,000.

The plaintiffs now seek, through the aid of a court of equity, to compel the defendants to turn these contracts over to the pool for the purpose of being auctioned off pursuant to the agreement. In refusing relief the court is not animated by any desire to protect the rights which the defendants claim they have. They are as guilty as the plaintiffs, and are simply in the more fortunate position of being defendants in a suit arising out of an agreement which the court regards as conceived in iniquity.

The preliminary injunction was granted by me, but that was on the ex parte application of the plaintiffs on a showing that disclosed a legal contract. Now, when all the facts are before me, I do not even reach the question whether, as argued by the defendants, the arrangement was one in restraint of competition, and to diminish the number of bidders, and consequently illegal, as against public policy. If this were the defendants' sole reliance, the injunction would have to continue. This was not a public sale or a public bidding. A combination to prevent competition at a forced public sale, by auction or otherwise, may affect the successful result, and act as a fraud on the rights of those persons powerless to prevent its consummation. But where bids are invited by a private party, he remains the sole judge whether to accept or to reject, to sell or not to sell. Marsh v. Russell, 66 N. Y. 288; Atcheson v. Mallon, 43 N. Y. 147, 3 Am. Rep. 678; Leonard v. Poole, 114 N. Y. 371, 21 N. E. 707, 4 L. R. A. 728, 11 Am. St. Rep. 667; Judd v. Harrington, 139 N. Y. 105, 34 N. E. 790; McCallum v. Grossman, 1 City Ct. Rep. 423; Baird v. Sheehan, 38 App. Div. 7, 56 N. Y. Supp. 228.

The broad ground on which I place my decision is the doctrine so succinctly stated in Story's Equity (13th Ed.) pp. 340, 341:

"The general rule is that particular persons in contracts and other acts shall not only transact bona fide between themselves, but shall not transact mala fide in respect to other persons who are in such relations to either as to be affected by the contract, or the consequences of it. And as the rest of mankind besides the parties contracting are concerned, the rule is properly said to be governed by public utility."

The plaintiffs and the defendants certainly endeavored to transact mala fide with respect to the Pennsylvania Company. Stripped to the bone, the situation is baldly this: The Pennsylvania Company, requiring a work of large magnitude to be performed, invites a definite number of persons to make their individual offers for the work. Instead of doing that, these persons get together, and, by a secret arrangement, decide to induce the belief that they are all bidding independently of each other, when in fact they have regulated and fixed the highest bid at the lowest possible figure. In order to carry out the deception—for it is nothing less—they put in what are in effect false bids, at a figure lower than the highest fixed by them. They are more culpable than they would have been, had they merely refrained from bidding. In that event a different question might be presented. But in order to deceive and mislead, and to give the impression that each bid was the independent best offer of the individual, they put in a series of false

lower bids, so as to assure the award of the contract to the bidder who represented, not himself, but all of them. Nobody was wanted in the pool who had not been invited to bid. The profits were to be restricted to those whom the company had asked to estimate. The combination was not formed for the proper purpose of carrying on a joint business. The motive was not honest. The aim went beyond even limiting competition to the point of destroying it, while leading the party most vitally interested to believe that it was securing that full and free competition which its invitation was intended to evoke.

The plaintiffs attempt to explain a great deal, but for the most part their explanations are ingenuous. Whatever rights they have as against the defendants flow from the first agreement, as confirmed by the subsequent resolution. Both are tainted with fraud. I am satisfied this injunction should be vacated.

Injunction vacated.