### SAM SIMON v. FRITZ GARLITZ.

Decided December 1, 1910.

**1.—Illegal Contract—Right of Action.**

·One may maintain action for his share of property conveyed to another for their joint benefit, irrespective of the means by which the conveyance was pro‑ cured, his right resting on the contract, and not on the manner of its pro‑ curement. But it is otherwise where, in order to show his own interest, he must show that he procured the conveyance to another in pursuance of an agreement with the grantee to share the profits, and in so doing it appears. that he procured it by fraudulent means and abuse of confidential relations.

**2.—Contract—Fraud—Public Policy—Confidential Relations.**

One who promoted the making of a contract by which property was ac‑ quired by another from a third party, by his use of the personal influence arising from his confidential relations with such person, the party benefited. agreeing with him to share the profits, and his interest being concealed from the other, to whom he represented himself as a disinterested and friendly adviser, could not maintain action for his agreed share of the proceeds, the transaction being fraudulent and against public policy.

**3.—Same—Friendly Relations.**

Mere professed love and friendship may be sufficient to establish such con‑ fidential relations that public policy will forbid the enforcement of a contract obtained by their abuse.

Appeal from the District Court of Tarrant County. Tried below before Hon. Jas. W. Swayne.

*Wray & Mayer,* for appellant.—As the contract of employment alleged by Garlitz was the bartering of his friendship and influence with the Brocks, which he alleges solely induced the exchange with Simon, and he fraudulently used his friendship and personal influence to consum‑ mate the trade, his alleged contract of employment is absolutely void, and he could neither recover from Simon for conversion, nor for parti‑

tion of the alleged acquests. 15 Am. & Eng. Ency., 945; Boleman v. Loomis, 41 Conn., 581; Holcomb v. Weaver, 136 Mass., 265; Oscanyon v. Winchester Arms Co., 103 U. S., 261; Meguire v. Corwine, 101 U. S., 108; Davis v. Sittig, 65 Texas, 501; Read v. Smith, 60 Texas, 381; Wiggins v. Bisso, 92 Texas, 222; Beer v. Landman, 88 Texas, 455; Morrison v. Bennett, 40 L. R. A., 159; Beach on Conts., sec. 1443.

*Wise & Baldwin,* for appellee.—In order that a contract may be rendered illegal on the ground that it tends to induce one of the parties to violate a confidence resposed in him by a third party, it is essential and must be shown that such party was under some legal duty, moral obligation or occupied some fiduciary position to such third party or person, which authorized such third person in confiding in him. Riley v. Wright, 118 S. W., 1134; 9 Cyc., 482; Marble Falls, etc., Bank v. Border, 9 Texas Civ. App., 670; Hoyt v. Holly, 30 Conn., 326; George v. East Tenn. Coal Co., 54 Am. Rep., 425; Liebke v. Knapp, 49 Am. Rep., 212.

The agreement will not be invalidated where it does not appear that the personal influence of the promisee was to be exerted in an improper manner or that improper means were intended to be used. Hunt v. Test, 42 Am. Dec., 659; Printing, etc. Co. v. Sampson, L. R., 19 Eq., 462.

Appellant can not be heard to complain, as the purpose of the contract has been accomplished, the fruits of Garlitz's labor have been received and are in the hands of Simon, and the court can direct a division of the proceeds. DeLeon v. Travino, 49 Texas, 89; Russell v. Kidd, 37 Texas Civ. App., 411; Smith v. Booty, 49 Texas Civ. App., 628; Floyd v. Patterson, 72 Texas, 202; 2 Rose's Notes, page 872; Brooks v. Martin, 2 Wall., 70; Planters Bank v. Union Bank, 16 Wall., 483; Sharp v. Taylor, 2 Phil. Ch., 801; Gilliam v. Brown, 43 Miss., 641.

HODGES, ASSOCIATE JUSTICE.—This suit was instituted in the court below by the appellee against the appellant to recover "the possession of one-half of the notes and bonds" described in exhibits attached to his petition, "or the value of the same in case delivery can not be had." The notes and bonds referred to consisted of one note executed by Henry and Mary Brock for $3,500 payable to the appellant as a part of the purchase price of a tract of land purchased by the Brocks, and certain bonds secured by mortgage on property in the State of Nebraska delivered to appellant as collateral security for the payment of the above mentioned note and another note held by one J. K. P. Hill. The rights of the appellee depend upon a contract which he asserts he made with the appellant regarding the sale of a tract of land to the Brocks. The nature of his suit is probably best stated in the language of his original petition. Omitting the formal portion, it says: "That the said Brocks and the defendant owned and controlled three certain lots, tracts and parcels of land situated on Rosen Heights in Tarrant County, Texas, and J. K. P. Hill owned and controlled certain lots,

tracts and parcels of land situated in Parker County, Texas, consisting of 392 acres, more or less, as shown and alleged herein. Plaintiff further alleges that the parties named herein were desirous of disposing of their several tracts of land so owned and controlled by them, and the defendant, well knowing of the friendly relationship and association of the said Brocks and the plaintiff and their families, employed plaintiff to talk with, advise, and to use his influence in inducing and causing the said Brocks to sell, exchange and transfer their said property to the said J. K. P. Hill for his property as aforesaid. Plaintiff further alleges that in accordance with said contract of employment, and in the performance of his duties thereunder, he, in company with defendant, went upon the premises of the said J. K. P. Hill in Parker County, Texas, and made a careful investigation and examination of the land, premises and improvements of the said J. K. P. Hill, and it was agreed by and between plaintiff and defendant that the plaintiff upon his return to Fort Worth, Texas, should talk with, advise and represent to said Brocks that the said property of the said J. K. P. Hill was well worth the amount of money for which it was sought to be sold and exchanged, and he should also advise the said Brocks to exchange their properties for the property of the said J. K. P. Hill. Plaintiff further alleges that he did and performed everything under said contract that he considered advantageous to making said sale and exchange under said contract." It is then alleged in substance that under the contract of employment plaintiff was entitled to one-half of the notes, bonds and property secured by Simon in making this sale or exchange, the value of which is placed at $1,925. The petition then avers that it was through appellee's advice, inducements and influence that appellant was enabled to make the sale to the Brocks, "that if he (appellee) had not so advised the said Brocks to make the said sale and exchange that they would not have made same." It is then alleged that the appellant "unlawfully took into his possession . . . the notes and bonds described in said exhibits . . . and has converted the same to his own use and benefit, and that by reason thereof the appellee has sustained damages in the sum of $1,925." After stating a demand on the part of appellee and a refusal by the appellant to deliver any part of the property described, the petition concludes with the following prayer: "Wherefore plaintiff prays that defendant be cited to answer this petition, and that he have judgment for one-half the notes and bonds described in said exhibits herein attached secured by defendant in said sale and exchange herein, and for the sum of $175 in cash, or for the value of the same as aforesaid, in case delivery of the same, or any part thereof, can not be had, together with damages and costs of this suit, and for general and equitable relief."

The exhibits referred to in the petition have already been sufficiently described. The appellant answered by a general demurrer and general denial. On a trial before the court without a jury a judgment was rendered in favor of the appellee for the recovery of "a one-half interest in the $3,500 vendor note and one-half interest in the collateral

property of the fair value of $3,500 placed to secure the payment of said $3,500, less the $600 to be paid by the defendant." Then follows a description of the notes and mortgage, which it is unnecessary here to repeat. The general demurrer interposed by the appellant was insisted on, and was overruled by the court, and that action is one of the errors assigned.

It is also contended by the appellant that the facts are legally insufficient to sustain the judgment rendered. The particular objection urged, both against the petition and the sufficiency of the facts, is that the one pleads and the other proves a contract opposed to public policy; that by the terms of the contract alleged and proved Garlitz undertook to sell his personal influence, abuse private confidence, and practice a deception upon the Brocks. Simon and Garlitz in their testimony differed very materially as to the existence of any such contract or agreement as that alleged in the petition. The court evidently accepted the version given by Garlitz, and no complaint is here made that he was not warranted in so doing. The following is substantially the testimony of Garlitz regarding his contract with Simon and what he did thereunder: All the parties—Simon, Garlitz and the Brocks—were near neighbors. An alley separated the homes of Simon and Garlitz, while there was only a fence between the residences of Garlitz and the Brocks. The two latter families were Germans and were on terms of intimate personal friendship. Garlitz frequently conversed with the older members of the Brock family in their native tongue. The transaction with Hill commenced by the latter approaching Garlitz and proposing to trade his property consisting of a farm of 392 acres in Parker County for some town property. While the two were talking Simon joined them and introduced himself to Hill as a real estate agent. After some further conversation it was finally agreed between all of them that on the following Sunday Garlitz and Simon should go out and inspect the farm. This was done, Hill agreeing to take $8,000 for it. Garlitz thus describes the contract with Simon: "It was the contract with Simon and me that we were to go out there and see the place, and when we had seen the property we were to decide whether the land was worth it or not, and then see how much we could pay for it . . . sell it for to Brock." On the evening following their return from their trip of inspection Simon met with the Brocks at their home for the purpose of talking over the prospective trade. What occurred on that occasion is not stated by Garlitz, as he was not present, having been called away on other business. In the course of a few weeks a trade with the Brocks was made, by which they took the Hill property, agreeing to pay therefor $12,000. A part of this payment was made in some lots which the Brocks owned in Rosen Heights valued at approximately $3,000; and the remainder to be paid in money, for which notes were given. The $3,500 note referred to in the petition is one of them. Prior to its consummation Garlitz frequently talked with the Brocks about the trade and told them that it was a good one for them to make. He says, "I advised with the Brocks about making this trade

with Hill . . . for their property. . . . I talked with them about once a day about the matter. I talked with Simon about what I was doing; he came over every morning to find out what I had said to the Brocks that day and what they were going to do." Again, referring to the morning after the visit to the farm, he says, "Adolph (Brock) came to me the next morning. I think he asked me what I thought about the place and about trading for it, and I told him it was a good trade for him if he could make the trade. My relationship with the Brocks was very close and confidential. We were very friendly with each other. They had a great deal of confidence in my judgment, and they relied upon my statements and representations to them. I don't think we could have made the trade if I ,(had) told them I had anything to do with the place. I told them I did not have a thing in the world to do with it." When asked if he told them he did not have any interest in it whatever, he answered, "I say no; only between me and Simon. Simon sent me to them. . . . I was boosting the property in order to get it sold and to make one-half of the profit." After telling Simon that the Brocks had come to him and asked him about the advisability of making the trade, and stating what he had told them, Simon then agreed to leave the matter all in Garlitz's hands. It also appears from the testimony of Garlitz that he was acquainted with the value of country property,. having some knowledge of farming, and that the Brocks relied upon his judgment to some extent on that account. In conferring with them about the trade, he talked with Henry Brock and his wife in German. The witness was very emphatic in attributing the success of the trade to his personal influence with the Brocks. Regarding the contract between him and Simon, he said, "I testified a moment ago that Simon employed me to use my influence to make the trade. I brought every influence to bear that I could." Again he says, "All I had to do was the boosting, and that is all I did do."

The foregoing statement presents all the facts necessary to a discussion of the decisive question in the case. That question is, was the contract pleaded and proved by the testimony of Garlitz enforceable? If not, it must be solely because it contemplated the doing of some act which the unwritten policy of our government will not sanction. The rule relied upon by the appellant is thus stated by the Supreme Court of Minnesota, in Torpey v. Murray, 93 Minn., 482, 101 N. W., 609: "It is well settled that a contract is void which has for its object the practice of deception or fraud upon a third party, or to take advantage of confidential relations with him for the purpose of drawing him into a bargain by which the party undertaking to use his influence will secretly receive a benefit from the seller." Again, in Southard v. Geo. W. Jump Co., 88 N. Y. Supp., 317, appears the following approved quotation from Story's Equity: "The general rule is that particular persons in contracts and other acts shall not only transact *bona fide* between themselves, but shall not transact *mala fide* in respect to other persons who are in such relations to either as to be affected by the contract

or the consequences of it. And as the rest of mankind, besides the parties transacting, are concerned, the rule is properly said to be governed by public utility." As announcing the same rule we refer to the following additional authorities: Bolman v. Loomis, 41 Conn., 581; Twentieth Century Co. v. Quilling, 130 Wis., 318, 110 N. W., 174; 15 Am. & Eng. Ency. (2d ed.), 945; 9 Cyc., 469, and cases cited; 1 Page on Contracts, sec. 403.

As a preliminary question we should first determine whether this is an action to enforce a contract, or one by one joint owner against another to recover an undivided interest in specific property. The petition is rather vague and indefinite respecting this contract. The testimony of Garlitz strongly supports the view that the agreement between him and Simon was a joint undertaking to make the sale to the Brocks and to share equally in the profits. If the petition could be construed as an action to recover a part interest in goods, or funds, which had been paid over to Simon for the joint benefit of the two, the defense here made would not be applicable. In such an event it would not be necessary to resort to the contract referred to in the petition in order to ascertain the rights of the parties. The fact that the original agreement under which the interest had been acquired was illegal would be immaterial. Floyd v. Patterson, 72 Texas, 202, 10 S. W., 526; 15 Am. & Eng. Ency. of Law (2d ed.), 1008, and cases cited. "The test," as stated in the case above cited, "is whether the plaintiff requires any aid from the illegal transaction to establish his case." If he does, then it follows that his demand is unenforceable and the law will leave the parties where they have placed themselves. Prude v. Campbell, 85 Texas, 4, 19 S. W., 890; Leach v. Devereux, 32 S. W., 837.

That the appellee has based his right of recovery upon the validity of the contract between Simon and himself, or so far relies upon that agreement that without it his right of action would be incomplete, will hardly be disputed. He alleges that he was employed by Simon to use his "advice" and "influence" in bringing about the trade, and that he did everything "under said contract that he considered advantageous to making same sale and exchange." He further avers that it was through his efforts and influence that the sale was finally made, and that but for his services the negotiations would not have been successful.

The question then arises, is the contract contrary to the rule of public policy announced in the decisions before referred to? In passing upon that issue we must be governed by what Garlitz contracted to do, rather than by what he may have done. It is the viciousness of his agreement, and not of his conduct, that must determine his right of recovery. Neither in the pleadings nor in the evidence are full details given as to what the contract obligated Garlitz to do. We have therefore had recourse to his testimony as to what he did, as his own interpretation of what he had agreed to do. Garlitz unquestionably had the right, notwithstanding his friendly relations with the Brocks, to engage his

services to aid in making the sale of the property. He had the right to boost the trade, as he terms it, in any legitimate manner which he might see proper to adopt. He had the right to hire himself to Simon to talk with and to endeavor to induce the Brocks to trade. But he had no right to engage himself to practice a deception amounting to a fraud upon the Brocks. It is immaterial whether or not any injury in fact resulted, nor is it essential to an avoidance of the contract that it must have necessarily contemplated the perpetration of a fraud. It is sufficient if such was its tendency and a fraud may be reckoned among the probable consequences of the part undertaken by Garlitz. Aycock v. Braun, 66 Texas, 201, 18 S. W., 500. Taking into consideration the situation of the parties, it is clear that Garlitz was employed on account of his intimate personal relations with the Brocks and was to conceal his interest in the trade the better to secure the benefit of his advice and counsel, as a pretended disinterested friend, in making a trade in which the contracting parties expected to realize a handsome profit. In stating what his contract bound him to do, Garlitz says he was to "talk with, advise, and to use his influence in inducing and causing the said Brocks to sell," etc. In testifying to the contract, he says that he and Simon were to inspect the Hill property, decide whether or not it was worth what Hill asked for it, $8,000, and then see how much they could sell it for to the Brocks. They then fixed the price at which they would sell at $12,000, and Simon employed him (Garlitz) to use his influence to make the trade. It is not usual to describe the solicitations and laudatory assertions of parties interested in making sales of real estate as "advice" to their prospective customers. The term advice implies an interest on the part of the adviser in the purchaser, not in the thing to be sold. The instant it becomes known that he has an interest to be subserved what he says is not longer looked upon as advice, but as representations accompanying a business offer, and is weighed accordingly. If what Garlitz says he did toward bringing the negotiations to a successful conclusion was within the contemplation of the parties as a part of what he contracted to do, there is no escaping the conclusion that they intended the perpetration of a deception that amounted to a fraud. He went under the guise of a friend, pretending to be moved by unselfish considerations only, and "advised" a confiding fellow countryman to make a purchase, solely for the profit the imposter might secure. To make the deception complete and totally disarm suspicion, he admits that he falsely denied having any interest in the transaction. It is difficult to conceive of a more perfidious undertaking, or one better calculated to victimize an ignorant purchaser, than that here planned and consummated. Counsel for the appellee meets the charge of illegality urged against the contract with this counter proposition: "In order that a contract may be rendered illegal on the ground that it tends to induce one of the parties to violate a confidence reposed in him by a third party, it is essential and it must be shown that such party was under some legal duty, moral obligation, or occupied some fiduciary position toward such third

party or person, which authorized such third person to confide in him." Accepting that as a correct statement of the law, does it alter the situation? Will it be contended that one friend has no right to rely upon the fidelity of another? Suppose he does; will it be said that such fidelity is not a moral duty? Love and affection always inspire confidence and a betrayal of the trust thus reposed is a species of moral infamy with few parallels in social degradation. Next to that domestic love upon which the home is founded, friendship's ties are the most sacred. When cemented by constancy they furnish the safest guaranty of the permanency of our social fabric and the most sublime assurance of its continued growth. It would indeed be a short-sighted policy in any government to refuse to recognize fidelity to such trusts and confidences as among the moral obligations of its citizens. The principal has a right to the fidelity of his agent because he has contracted for it, and a ward to that of the guardian because the law exacts it; but a friend has a right to the fidelity of a friend because the latter has invited it. We have therefore concluded that under the undisputed facts as testified to by the appellee himself, his contract is opposed to a sound public policy and should not be enforced.

The judgment of the District Court is reversed and judgment here rendered in favor of the appellant.

*Reversed and rendered.*

Writ of error refused.